Realty Corporation v. Commissioner.
Realty Corp. v. Commissioner
Docket No. 7488.
United States Tax Court
1946 Tax Ct. Memo LEXIS 55; 5 T.C.M. (CCH) 868; T.C.M. (RIA) 46246; October 16, 1946
Trafton M. Dye, Esq., 1406 Williamson Bldg., Cleveland 4, Ohio, for the petitioner, Lawrence R. Bloomenthal, Esq., for the respondent. KERN
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income tax for the calendar years 1940, 1941 and 1942 in the respective amounts of $2,980.78, $5,234.37 and $7,542.40, and in its declared value excess profits tax for 1942 in the amount of $423.44. The deficiencies arose from respondent's denial of petitioner's right to use the substituted basis of its transferor corporation of certain real estate transferred pursuant to a 77-B reorganization in 1936, affecting the amount of depreciation and other deductions and long-term capital gains. There are several issues involved in the proceeding, but the petitioner moved for severance *56 of the first issue for hearing and determination prior to the hearing and determination of the other issues. The motion was granted on March 6, 1946, and the issue now presented is limited to the question whether the 77-B reorganization constituted a tax-free reorganization within the meaning of section 112(g)(1) of the Revenue Act of 1936, as retroactively amended by section 213(g) of the Revenue Act of 1939. Findings of Fact The facts are all stipulated, and we find them to be as stipulated. Petitioner filed its income and declared value excess profits tax returns for the tax years with the collector of internal revenue for the eighteenth district of Ohio at Cleveland. Realty Corporation of Cleveland (referred to hereinafter as the old company) was an Ohio corporation organized in 1929 to purchase and operate income-producing real estate. It was authorized to issue 20,000 6 per cent cumulative preferred shares of the par value of $100 each, and 20,000 shares of no par value common stock of a declared value of $5 each. Dividends on the preferred stock were payable quarterly in preference to any dividends on common stock. Each share, whether preferred or common, was entitled *57 to one vote. The old company in 1929 and 1930 acquired the nine income-producing properties involved here. All but two were subject to mortgages. By the latter part of 1935 the old company was unable to pay its debts as they became due and payable. The Board of Directors, by resolutions adopted November 29, 1935, determined to reorganize under the provisions of section 77-B of the Bankruptcy Act, and proposed the outlines of a plan of reorganization. As of September 30, 1935 (the date of the old company's balance sheet attached to its 77-B plan of reorganization) its financial condition was as follows: Seven of its nine properties were subject to mortgages aggregating the principal sum of $884,508.34, substantially all of which had become due and payable; delinquent taxes and assessments aggregated $47,242.35; accrued and unpaid interest aggregated $67,854.72, of which more than $53,000 was delinquent; accrued and unpaid dividends on preferred stock aggregated approximately $500,000, and dividends on preferred stock were continuing to accrue at the rate of $93,684 a year; no dividends had ever been paid on any stock, either common or preferred. On December 2, 1935, the old *58 company filed with the United States District Court at Cleveland its petition for reorganization under section 77-B of the Bankruptcy Act then in force. The petition disclosed that while the assets of the old company exceeded its liabilities, and there was a substantial equity for preferred stockholders, the corporation was unable to meet its obligations as they matured and there was imminent danger that the mortgage creditors would foreclose, and valuable equities would be lost. On December 2, 1935, the District Court entered an order approving the petition as properly filed, continued the old company as debtor in possession, and referred the matter generally to a Special Master. At the time the petition for reorganization was filed, the old company had outstanding 15,614 cumulative preferred shares, and 15,557 no par common shares. There were 41 preferred shareholders, all but one of whom owned common shares. The preferred shareholders owned 15,270 or more than 98 percent of the common shares outstanding. There were only three holders of 287 common shares who did not also own preferred shares. John D. Fackler, president of the old company, owned 24 preferred shares and 6,860 *59 common shares. On December 2, 1935, the old company filed with the Special Master a plan of reorganization, which proposed: (a) That the maturities of the mortgages be extended five years from January 1, 1936; the interest rate thereon be reduced to 3 percent per annum; and that the accrued interest be paid at the rate of 3 percent instead of the rates specified in the respective mortgage notes. (b) That all the outstanding preferred and common shares be eliminated, and that 15,614 new common shares without par value (the number of preferred shares then outstanding) be authorized; that the holders of the preferred shares be given the right at any time before noon of December 31, 1935, to subscribe pro rata for the new shares at $1 per share; and that the common stockholders should have no right in the reorganized company. (c) That Fackler should purchase all shares in the reorganized company not taken by other preferred shareholders, at $5 per share, should lend the reorganized company such sums as should be needed to complete the cash requirements of the Plan, for a term of 5 years, with interest at 3 percent, and should agree to act as president and counsel of the reorganized *60 company without compensation for five years. (d) That the plan be carried into execution either by amending the articles of incorporation of the old company so as to eliminate all old shares and to authorize the new shares, or by the organization of a new company authorized to issue the new shares to be distributed as provided by the plan. In either event the certificates evidencing the old preferred and common shares should become void and be cancelled. By noon December 31, 1935 the holders of 9,964 preferred shares had elected in writing to "purchase" a like number of common shares of the reorganized company and to pay $1 per share therefor. A list of such preferred shareholders was filed with the Special Master on December 31, 1935. On December 31, 1935, the Special Master entered an order allowing claims, classifying creditors and shareholders, and finding that the plan had been accepted by all creditors affected thereby, by the holders of 14,914 shares of preferred stock, and by the holders of all common stock. On January 4, 1936, the Special Master filed his report with the Court concerning his proceedings, and recommending confirmation of the plan by the Court. On *61 January 25, 1936, after due notice, hearing was had before the District Court, which then entered a decree approving the proceedings of the Special Master, approving the plan, directing that the plan forthwith be carried into execution, ordering the old company to make written report prior to February 24, 1936, of all things done by it in carrying the plant into effect, and continuing the hearing until that date for consideration of the report. In its decree of January 25, 1936, the Court said, in part, (10) That the Debtor deems it more feasible to organize a new corporation under the laws of Ohio to carry out said Plan, which method of procedure is hereby approved; * * * that the Debtor, its officers and directors and the Reorganization Committee * * * be, and they are hereby, authorized and directed forthwith to proceed to carry said Plan into execution, and for said purpose to cause to be organized under the laws of the State of Ohio said new corporation having the requisite number of common shares provided for by said Plan, and to use the name of the Debtor (or any variation thereof) for said new corporation., to convey to said new corporation all of the assets of the Debtor, *62 which said new corporation shall assume all of the obligations of the Debtor as modified by said Plan of Reorganization and by this decree, and which corporation shall enter into all the agreements necessary or desirable to carry out the said Plan, and that the Debtor is hereby authorized to take all corporate action necessary in the consummation of said Plan; (11) That the Debtor shall transfer and convey to the new corporation to be organized in pursuance of the Plan all of its property dealt with by the Plan (being all of the property of the debtor wheresoever situated), by proper deeds and other instruments of conveyance, * * *. Pursuant to this decree and the plan of reorganization, Articles of Incorporation of a new corporation, Realty Corporation, were filed with the Secretary of State of Ohio on January 31, 1936, which new corporation is the petitioner here. Petitioner was authorized to issue 15,614 no par common shares. The holders of 9,964 preferred shares of the old company who had elected to take shares in the new company, paid to petitioner $1 for each share they had elected to take, and certificates were issued to them representing their new shares, dated February 19, 1936. *63 The first meeting of the shareholders of petitioner was held on February 11, 1936, at which time a code of regulations was adopted, and directors were elected. The directors then met, organized and elected officers. Pursuant to the plan of reorganization and the decree of the District Court, the old company conveyed all its assets to the new company. In accordance with his agreement, John D. Fackler, in addition to subscribing for the 24 shares of stock to which he was entitled to subscribe by reason of his ownership of 24 shares of preferred stock in the old company, subscribed to all the shares not taken by other preferred shareholders, which amounted to 5,650 shares, at $5 per share. In addition, he loaned petitioner $52,000, evidenced by a promissory note payable on or before 5 years after February 11, 1936, with interest at 3 percent, secured by a mortgage on petitioner's unencumbered real estate. On February 21, 1936, the old company filed with the District Court a report that the plan was fully executed, and consummated, and prayed for a final decree. On February 24, 1936, after hearing, the District Court entered a final decree declaring the plan fully consummated; *64 and closing the proceedings. No provision of any kind or character was made either in the plan or in the consummation thereof for common shareholders of the old company, or preferred shareholders of the old company who did not elect to subscribe for shares of petitioner in the manner authorized by the plan. The directors of the old company became the directors of petitioner. The officers of the old company and the officers of petitioner were the same persons, except that a vice-president of petitioner was elected, whereas the old company had had no vice-president. The two principal mortgage creditors of the old company conditioned their acceptance of the plan upon its consummation by March 2, 1936. Neither expressed any preference as to the corporate entity to be used. The decision to organize a new corporation, rather than to use the old, was prompted by the necessity for prompt action which was assured only by the method adopted. By the consummation of the plan of reorganization, the financial condition of the business theretofore conducted by the old company and transferred to petitioner was materially improved in the following respects: 1. The maturities of the mortgages, *65 aggregating $884,508.34 (nearly all due or in default) were extended for five years from January 1, 1936; 2. The annual interest rate was reduced to 3 per cent, the annual interest charged was reduced from $46,008 to $26,535; 3. New money aggregating $38,214 was paid in by stockholders, Fackler has loaned petitioner $52,000 for five years from January 1, 1936, at 3 percent per annum, secured by mortgage; 4. All delinquent taxes, aggregating $45,466.07 were paid; 5. All accrued interest, to December 31, 1935, was paid at the rate of 3 percent, the amount paid being $39,427.20 and the amount cancelled $36,880.20; 6. All accrued dividends on preferred stock were cancelled, and the accruals eliminated; 7. Working capital in excess of $5,000 was secured; 8. Fackler agreed to serve as president and counsel for petitioner for five years without compensation; 9. Both preferred and common stock of the old company was eliminated, the certificates cancelled; 10. The old articles of incorporation were cancelled; and 11. Petitioner issued only common stock. All of the nine properties purchased by the old company in 1929 and 1930 were transferred to petitioner pursuant to the plan of reorganization *66 had depreciable buildings situated on them. The old company owned 8 of them in fee simple, and had a leasehold estate in the ninth under the terms of a 99-year lease. As of January 1, 1936, the old company's adjusted cost basis of all the buildings and improvements upon said properties, except one building known as the Roberts-Annex Building, the remaining life as of January 1, 1940, and the annual rates for straight line depreciation applicable to the bases adjusted as at January 1, 1940, for the tax years in controversy, were as follows: Building
Old Company's Ad-
Remaining Life at
Annual Rate of
justed Basis as of
January 1, 1940
Depreciation
January 1, 1946
Kinsman
$ 34,984.00
40 years
2.5%
1620 Euclid
144,100.00
40 years
2.5%
Lee Redwood
14,455.50
40 years
2.5%
Point
21,925.00
40 years
2.5%
Roberts
131,234.82
30 years
3.3%
Sheriff Street
204,294.15
15 years
6.7%
Ontario
13,493.21
10 years
10.0%
High
14,480.41
10 years
10.0%
$578,967.09
The remaining life of each of said buildings as of January 1, 1936, was four years more than the period shown above. In 1930 theold company purchased four first mortgage leasehold *67 7 percent coupon bonds of the Buckeye-Sheriff Street Realty Company, an Ohio corporation, dated April 1, 1924, of the face amount of $1,000 each, secured by a bond mortgage to a corporate trustee. The old company paid $3,440 for the bonds. No interest was paid thereon after October 1, 1929, except as hereafter set forth. In the consummation of the plan of reorganization the old company transferred said bonds to petitioner. In 1938, petitioner purchased an additional $1,000 bond of the same issue for $250. After extensive litigation petitioner's said bonds were ordered paid in full, and in 1941 petitioner received $10,617.24 in full payment of its bonds, plus accrued interest. Petitioner incurred and paid as expenses in connection with the litigation over said bonds the sum of $2,700. In January of 1930 the old company subscribed for 247 shares of the capital stock of Huron-Fourth Packing, Inc., for which it paid the sum of $494. Said shares were transferred to petitioner by the old company in the consummation of the plan. The "Reserve for Unrealized Loss" set out in the balance sheet of the old company which was attached to the petition for reorganization and to the plan, is the *68 difference between the tax valuation of the properties owned by the old company as shown by county duplicates and the depreciated cost of said properties. The 77-B reorganization involved here had a bona fide corporate business purpose. There was a continuity of the proprietary interest in the business enterprise before and after the reorganization. Opinion KERN, Judge: All of the facts having been stipulated by the parties, we have for decision the question of law, whether the reorganization under section 77-B of the Bankruptcy Act was a tax-free reorganization within the meaning of section 112(g)(1) of the Revenue Act of 1936, as amended. If it was, petitioner is entitled to use the substituted basis of its transferor, the old company, in computing its allowances for depreciation, and its gain or loss upon the disposition by sale or demolition of property acquired in the reorganization. Section 112(g)(1) of the Revenue Act of 1936, as amended by section 213(g) of the Revenue Act of 1939, reads as follows: The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation, in exchange solely for all or a part of its voting *69 stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded; or the acquisition by one corporation in exchange solely for all or a part of its voting stock of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, or, (D) a recapitalization, or (E) a mere change in identity, form, or place of organization, however effected. Petitioner contends that the reorganization involved here meets the requirements of clauses (B), (C), (D) and (E), and that its compliance with any one of such clauses justifies petitioner's claim that the reorganization was tax free. Respondent contends that none of those clauses is applicable to the transaction *70 here presented. We shall consider first the applicability of clause B, which defines as a reorganization "the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation". Respondent contends that this provision of the statute does not apply, first, because there was not an "exchange" of the petitioner's stock for properties of the old corporation, but rather a purchase by the stockholders of stock in petitioner for $1 per share, and, second, that if there was such an exchange, it was not "solely" for voting stock. We disagree with this contention. In our opinion, petitioner did acquire the property of the old company, and did exchange for that property and for additional cash, its voting stock. We do not think that a realistic view of all the evidence supports any theory that petitioner's stock was "purchased" for $1 per share, in a transaction separate and apart from the transfer to petitioner of the property of the old company. We think there was here a compliance with the terms of the statute, in that all of the properties of the old corporation and cash were acquired by the new, in exchange *71 for the voting stock of the new, the assumption of some liabilities, and nothing more. The plan of reorganization comprehended the issuance of petitioner's stock in exchange for the transfer to it of the old company's property plus the cash payments and not for the cash payments alone, as would be true of a "purchase". See , affirmed . The fact that cash was paid in addition to the transfer of property does not take these facts out of the purview of section 112(b)(4), which relates to what is received by the transferor, not to what is transferred by the transferee. See George E. Hamilton, 30 B.T.A.. The fact that liabilities of the old corporation for taxes and interest were assumed by petitioner is, by express statutory provision, to be disregarded. Nor can we see that the fact that the new corporationborrowed funds with which to pay the taxes and interest obligations, or used for that purpose some of the cash received along with the property of the old corporation in exchange for its stock, interferes with our conclusion *72 that this was a tax-free exchange. This situation is to be distinguished in the most important fundamental respects from the situation which the Supreme Court found to be a fatal impediment to a tax-free status in . There the money which was borrowed was paid to the holders of securities in the old corporation, which affected the basic requirement of the statute that the property be exchanged solely for stock or securities in order to qualify as tax-free. The borrowing of money to pay outside obligations which were assumed would not have this result. We are of the opinion that the reorganization involved here was tax-free under the provisions of section 112(g)(1)(B) of the Revenue Act of 1936, as amended, and that the respondent erred in determining otherwise. It is therefore unnecessary to consider the contentions of the parties with regard to the applicability of other provisions of this section of the statute. We are given to understand by counsel upon brief that in the event our holding upon the issue now presented should be as it is, no further hearing herein will be necessary. If we are in error as *73 to this understanding either party may file a motion for such further hearing, subject to the timely filing of such a motion. Decision will be entered under Rule 50.